IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-64,686-01






EX PARTE FREDERICK O'NEAL SCOTT, Applicant









ON APPLICATION FOR A WRIT OF HABEAS CORPUS

CAUSE NUMBER 98-9-9114 IN THE 24TH 

JUDICIAL DISTRICT COURT FROM DEWITT COUNTY




 Per curiam.


O R D E R


 

 Frederick O'Neal Scott filed the instant application for a writ of habeas corpus
pursuant to Article 11.07 of the Texas Code of Criminal Procedure challenging his 
conviction for deadly conduct. After reviewing the record before us, we conclude that Scott
is not entitled to relief. 

Facts and Procedural History


 Scott waived indictment, agreed to be charged by information with the third-degree
felony offense of deadly conduct, and entered a plea of guilty on September 1, 1998. 
According to the terms of Scott's plea bargain, the trial judge deferred a finding of guilt and
sentenced Scott to seven years' community supervision and assessed a $2,000 fine. Scott did
not appeal.

 On November 9, 2000, the State filed a Motion to Adjudicate Guilt and Petition for
Revocation of Probated Sentence. The trial judge signed two orders pertaining to Scott's
competency to stand trial: (1) on February 1, 2001, the judge ordered Dr. Robert Lyman to
examine Scott; (2) on May 3, 2001, the judge ordered Scott to be examined at Vernon State
Hospital. Dr. Lyman sent a report to the judge stating that Scott would not cooperate with
him during the interview. On May 18, 2001, after receiving the report from Vernon State
Hospital, the trial court issued an order finding Scott competent to stand trial.

 On June 28, 2001, the trial judge agreed to "take up" Scott's written objections to the
competency report before proceeding on the State's motion to adjudicate. Scott's
adjudication attorney tendered a questionnaire completed by Scott's prior (or first)
adjudication counsel, (1) which the trial judge admitted without any objection by the State. In
response to the written questions about Scott's ability to consult with him and cooperate,
Scott's prior attorney stated that Scott "yells and talks about matters not germane to his
cases." And when asked if Scott made any bizzare statements or observations, counsel said
that "'[b]izzare', is a relative term" and that Scott "demonstrated a complete lack of
understanding of the judicial system and refuses to listen to any information contrary to his
own beliefs about the legal system." He stated that Scott believed that counsel was "part of
a corrupt and redneck judicial system." He further stated that Scott advised him "that he had
a history of mental problems and/or hospitalizations." According to counsel, Scott
contentiously yelled at and interrupted the judge, ignored the judge's instructions, and went
on about his beliefs about the legal system. As a result, Scott had been temporarily restrained
and gagged. 

 Scott's counsel also submitted a psychological evaluation from 1999 for the judge's
consideration. The court admitted the report after the State submitted that it had no
objection. The evaluation states that Scott's performance on the Wechsler Adult Intelligence
Scale-Revised IQ test (WAIS-R) "placed him in the Average range of intellectual
functioning" and provides the following under the heading "DIAGNOSTIC IMPRESSION:"
Axis I: Major Depressive Disorder, single episode, moderate; Alcohol Dependance (by
history, in remission); Polysubstance Dependence (by history, in remission); Axis II:
Narcissistic personality Disorder (Provisional). 

 Having been previously granted permission to call witnesses to support his objections,
Scott's attorney called Scott's prior adjudication counsel to testify. When asked if Scott had
a reasonable degree of rational understanding regarding the current charges against him,
Scott's prior adjudication counsel answered in the affirmative based on his observations and
experience. He responded similarly when asked if Scott had a factual understanding of the
proceedings. Additionally, he testified that it was difficult to communicate with Scott,
stating "When I would try to talk to him, I would be interrupted, and I would just let him go
on." 

 Scott was then called to offer testimony. Scott stated that he was taking Doxepin for
his sleeping disorder and that this was the only medication he was taking. He stated that he
has never been hospitalized for any mental or emotional problems. He also testified,
consistent with documentation submitted to the trial court, that he receives social security
disability benefits. When asked why he receives such benefits, Scott stated:

 Apparently because Social Security ruled in my favor in the belief that indeed
I was tortured based upon the medical evidence I presented to them, and
because for that reason, I can't work. My emotional condition is not the way
it should be. My tolerance is not the way it should be . . . .


Further, he stated that his mother, as his guardian, receives his social security disability
benefits. He maintained that he suffers from memory loss and that he has "forgotten entire
days." 

 Scott also offered information about being tortured by Victoria County law
enforcement officials in 1996. According to Scott, when he was arrested for a parking
violation, he was maced from his waist up and held down on a fire ant bed. He was taken
to the station where he was strapped in a chair for six to seven hours without being able to
remove the mace. He was then moved to a room where he was held for seventeen to eighteen
hours, again without being able to remove the mace. He stated that he endured twenty hours
of pain. 

 Scott also conveyed his opinion that his community supervision should not be revoked
because of the incident in Victoria County. He asserted that he received no assistance from
the State to deal with his mental/psychological problems that were caused by law
enforcement officials. He also maintained that he has been the victim of a conspiracy by
state officials and that state officials are in some way retaliating against him due to a pending
federal suit (presumably concerning the Victoria County incident). And when asked if
understood that he could be sentenced to ten years' imprisonment if the trial judge found him
competent, Scott stated:

 I know what they're trying to do. Do I understand it? No, I don't. As far as
I'm concerned, this Court has no business in the matter at hand, period. As far
as I'm concerned, since I was tortured, before I committed the deadly offense,
the deadly force offense, as far as I'm concerned, I don't know exactly where
I stand on that. I know - - I don't know how the law views it, but as far as I'm
concerned, you don't have any rights sitting back convicting me or doing
anything to me when I sit back there and committed an offense while - - while
being sick. And on top of it, it is a sickness that the State caused. 


 In summation, Scott's attorney argued the following:


 I think you can look at the facial affectations of the - - my client, as he sits
there, his tone of voice, the answers to my questions, the fact that he is on
Social Security disability, the fact he is on medication, [Scott's prior
adjudication counsel's] answers to my questions, the written ones, I think he
has - - apparently, he is a very angry person, but it does not seem as if the
questions were basically truthfully answered. I do not believe he has a
sufficient present ability to consult with his - - to consult with me. I don't
believe he has a rational understanding of these proceedings. I'm gonna ask
that you find him incompetent, your Honor, at this proceeding. 


 The trial judge denied Scott's objections, concluding 


 On the evidence and on the Court taking judicial notice of the report from the
Texas Department of Mental Health and Mental Retardation Vernon State
Hospital, which is dated May 11, 2001, and which is on record in this cause .
. . the Court denies the objections to the finding of the incompetency report,
and we will now proceed with the State's Motion to Adjudicate Guilt . . . .


 Following a hearing on the State's motion, the trial judge adjudicated Scott guilty and
sentenced him to ten years' confinement.

 Scott's notice of appeal was filed on July 23, 2001, and the Thirteenth Court of
Appeals dismissed the appeal for lack of jurisdiction on August 22, 2002. (2) Scott then filed
this application for a writ of habeas corpus in the district court on March 27, 2006. He
argues, among other things, that he was "denied due process because he was incompetent at
the time of the adjudication hearing." 

Law and Analysis


 In 2003, in McDaniel v. State, this Court further clarified Article 46.02, Section 2,
subsections (a) and (b). (3) In doing so, we offered the following five-step analysis:

 1) if a competency issue is raised by the defendant, any party, or the court; and


 2) evidence of incompetency is brought to the attention of the trial court by the
defendant, any party, or the court;


 3) of the type to raise a bona fide doubt in the judge's mind regarding the
defendant's competency to stand trial; then


 4) the judge must conduct a Section 2 'competency inquiry' to determine if
there is some evidence sufficient to support a finding of incompetence, and if
there is,


 5) the judge must impanel a jury for a Section 4 'competency hearing.' (4)

 It is not until the fourth step that the standard set forth in Sisco v. State--that "the trial
court is to assay just that evidence tending to show incompetency, putting aside all competing
indications of competency, to find whether there is some evidence, a quantity more than a
scintilla, that rationally may lead to a conclusion of incompetency" (5)--is applicable. 

 In his first ground for relief, Scott alleges that he "was denied due process because
Applicant was incompetent. The trial court was apprized of the fact that Applicant was
incompetent but the Judge refused to have the question of Applicant's competency
determined by a jury." In support of his argument, Scott has submitted an evaluation from
a clinical psychologist dated August 1, 2005, which states the following under "FORENSIC
RECOMMENDATIONS:" Scott was "most likely not competent to stand trial at the time of
the Deadly force and Motion to Revoke Probation hearings." Because of the nature of
Scott's claim, in that it challenges the trial judge's competency determination, the 2005
evaluation is not relevant to our resolution of Scott's first ground for relief. (6) 

 In this case, the evidence before the trial judge prior to the start of the adjudication
proceedings--the competency report and the evidence presented in support of Scott's
objection to the trial judge's competency determination--demonstrates that the trial judge
concluded that the evidence did not "raise a bona fide doubt in the judge's mind regarding
the defendant's competency to stand trial[.]" (7) The factual findings underlying the judge's
conclusion are entitled to deference. (8) So assuming that due process requires the procedural
standards provided under Article 46.02 (now Article 46B) (9) to be applied to revocation
proceedings, Scott failed to meet his burden under Article 46.02. Because Scott has failed
to show that the trial judge erred in finding him competent to stand trial and in overruling his
objections to that determination, Scott has not proven that he is entitled to habeas relief. 

 Finally, we have reviewed Scott's remaining three grounds for relief and conclude that
they are without merit. Scott's application for a writ of habeas corpus is therefore denied. 


DATE DELIVERED: February 7, 2007

DO NOT PUBLISH

 
1. This attorney represented Scott on a prior motion to adjudicate and on the
November 9, 2000, motion to adjudicate before he was granted permission to withdraw. 
2. Scott v. State, No. 13-01-512-CR, 2002 Tex. App. LEXIS 6167, at *5 (Tex.
App.--Corpus Christi August 22, 2002) (not designated for publication).
3. 98 S.W.3d 704, 710 (Tex. Crim. App. 2003); see also Alcott v. State, 51 S.W.3d
596 (Tex. Crim. App. 2001).
4. McDaniel, 98 S.W.3d at 710-11.
5. 599 S.W.2d 607, 613 (Tex. Crim. App. 1980).
6. See Hardesty v. State, 667 S.W.2d 130, 134 (Tex. Crim. App. 1984) ("When
appellate courts are asked to determine whether the trial court erred in overruling a
pretrial motion the general rule is that we consider only evidence adduced at hearing on
that motion and do not resort to testimony subsequently elicited at trial because the ruling
in issue was not based on the latter."). 
7. McDaniel, 98 S.W.3d at 711.
8. Id. at 713.
9. Id. at 709 (stating "due process standards are built into . . . 42.02.") (citing
Alcott, 51 S.W.3d at 599).